UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANTOINE D. MEEKS, | |
| Plaintiff, | |
| v. | Case No. 3:22-cv-2377-JPG |
| JARROD PETERS et al., | |
| Defendants. | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the defendants' motion for partial summary judgment (Doc. 40). The defendants—the former sheriff of Randolph County, Shannon Wolff; the former jail administrator ("J.A.") and current Randolph County sheriff, Jarrod Peters; and correctional officers Chris Guisen and Cody Usher—filed their motion on February 7, 2024. Finding that summary judgment is appropriate for some of the defendants and claims but not others, the Court **GRANTS in part and DENIES in part** partial summary judgment.

The Court **GRANTS** summary judgment as to Shannon Wolff and Chris Guisen on all counts and **GRANTS** summary judgment as to Jarrod Peters and Cody Usher on Count Two. However, the Court **DENIES** summary judgment for Peters on Count One. As the defendants did not move for summary judgment on Count One for Usher, that claim is also retained.

I.  **BACKGROUND**

  A.  **Factual Background**

The plaintiff, Antoine Meeks, was a federal pretrial detainee at Randolph County Jail. He was booked on August 22, 2022, and housed in Cell Block 4. Two days later, Defendant J.A. Peters entered Block 4 and spoke to two other inmates about relocating them from Block 4 to

Block 2; however, those inmates told Peters that "they had issues with inmates in [B]lock 2 in relation to their case, and requested not to be moved." (Doc. 40). Accordingly, "Peters made the decision to move another inmate," (*Id.*), that other inmate was Meeks. Meeks claims that he told Peters and Guisen that he had enemies in Block 2, but Peters and Guisen disagree.

The next day, on August 25, 2022, Meeks returned from court and Defendant Officer Usher moved him to Cell Block 2. What precisely Meeks told the defendants while in the process of being moved is disputed. Usher claims that he asked Meeks if he had any enemies in Block 2, Meeks replied that he did not, and greeted the occupants of Block 2 in a friendly manner. Meeks, on the other hand, claims that Usher never asked him if he had any enemies, but that he told Usher he could not go to Block 2 because he was "into it with" some of the inmates there but Usher refused to return him to Block 4—stating that the decision was "above his pay grade." (Doc. 40, Ex. B at 37:11-24) (hereinafter "Pl. Depo.").

Both Meeks and Usher agree that Meeks mentioned "M1,"—the alias of Maurice Lee, an inmate in Block 2—but they disagree on the context. Usher claims that Meeks repeatedly muttered the name unprompted, and not in relation to any question or comment about any concerns with the move to Block 2. Meeks, in contrast, claims that he provided the alias when explaining to Usher who he was in conflict with when Usher asked him who *specifically* was a concern of his in Block 2.

Regardless, Meeks was placed in Block 2. Immediately after Meeks entered Block 2, Meeks was attacked by four inmates, including Lee. Meeks yelled for help; Usher heard Meeks's call for aid, returned to Block 2, saw the assault in progress, and ordered a lockdown of the Block.

When Officer Usher reached Meeks, he had sustained injuries to his head and body.

Meeks alleged that he lost consciousness for a few seconds during the assault and that his memory is hazy. The order of the events that took place in the aftermath is not entirely clear. Based on the affidavits and deposition, in the immediate aftermath, Meeks was taken into the Booking Room. Officer Usher checked Meeks's vital signs and determined that he was not in imminent danger. Usher then told Meeks he would call the doctor. After calling the doctor, Usher was advised to provide Meeks with Tylenol and an ice bag.

Meeks claims that he asked if Usher "could take pictures, . . . get something for [his] headache, and go to the hospital." (Pl. Depo. 45:13-19). Neither Usher nor the doctor that Usher had called advised that Meeks be taken to the hospital. Meeks called a family member who recommended he seek treatment at a hospital. Pictures of his injuries were taken later that night by Officer Usher, but in the morning, J.A. Peters claimed he had not received those pictures.

The jail nurse visited Meeks's cell the next day. According to Meeks, she did not physically examine him; rather, she stood outside his cell, asked if he was all right, and inquired whether he was on any medication. Meeks responded that he was fine and that he had received Tylenol.

Meeks claims he asked both Defendant Peters and the nurse to go to the hospital, but both refused. Meeks claims he asked multiple officers but, beyond stating that he made those requests the morning after the attack, he does not detail the circumstances of those interactions. Meeks alleges that the stated reason jail staff and the nurse gave him for refusing to take him to the hospital was that his injuries were not life-threatening. Meeks did not request medical treatment again until over a month later, for headaches that he alleges have become increasingly painful since the attack.

### B. Procedural Background

Meeks filed this civil rights action pursuant to 42 U.S.C. § 1983 in the United States District Court for the Eastern District of Missouri, and it was transferred to this District on October 12, 2022. *Meeks v. Peters, et al.*, Case No. 22-cv-00996 (E.D. Mo. filed Sept. 22, 2022).

In his complaint, Meeks alleged that the defendants violated his Fourteenth Amendment rights by failing to protect him from violence and by refusing to provide him with adequate medical care. Meeks demands a jury trial and seeks money damages. (Doc. 1).

At screening, the Court determined that Meeks's claims are as follows:

**Count One:** Fourteenth Amendment claim against defendants for moving plaintiff to Block 2 dorm on or around August 25, 2022, despite Plaintiff's complaints about death threats from known enemies housed there.

**Count Two:** Fourteenth Amendment claim against defendants for denying plaintiff medical care for the injuries he sustained in the inmate attack on or around August 25, 2022.

**Count Three:** Illinois state law claim for intentional infliction of emotional distress against defendants for moving plaintiff to a cell block with his known enemies immediately before his attack on or around August 25, 2022, and then denying him medical care for his injuries.

At screening, Count Three was dismissed without prejudice for failure to state a claim. All claims against the Randolph County Sheriff Office were dismissed as well. While Count One and Count Two against the defendants survived screening, the supervisory capacity and official capacity claims against all defendants were dismissed without prejudice—meaning the claims against the remaining defendants were only in their individual capacities.

On February 7, 2024, the defendants filed a motion for partial summary judgment and an accompanying Rule 56 notice. (Docs. 40, 41). In that motion, they requested that the Court grant summary judgment in favor of Defendants Peters, Guisen, and Wolff on all counts, and grant summary judgment in favor of Defendant Usher on Count Two. The defendants did not seek

4

summary judgment in favor of Usher on Count One.

Despite being served both the motion and the Rule 56 notice, the plaintiff failed to respond to the motion within the thirty-day timeframe required by local rules. *See* SDIL Local Rule 7.1(b)(1)(A). However, the defendants took no action in relation to their motion. Months passed with no action from either the plaintiff or defendant. In the absence of the plaintiff's response and the defendants' lack of action; on August 1, 2024, the Court, *sua sponte*, ordered the plaintiff to show cause by August 15, 2024, as to why summary judgment should not be entered against him. (Doc. 42). On August 28, 2024, the Court received the plaintiff's response. While his response had not been received by the Clerk's Office until two weeks after the deadline had expired, his response had been deposited in the prison's mailing system on August 14, 2024—before the deadline had expired. (Doc. 43).

In his response, the plaintiff states that he did not receive the order to show cause until a week after it had been issued. In explaining his delay on responding to the motion for summary judgment, the plaintiff states that he had been moved to a different jail and that, prior to his relocation, he was receiving help from "another inmate, a 'jailhouse lawyer,'" but no longer had access to him. (*Id.*). After being placed in federal custody, the plaintiff states that he "had no idea on what to do or how to proceed. Despite the Court's warning, he did not understand the implications or consequences of not offering an immediate response." (*Id.*).[1]

The plaintiff opposes the defendants' motion and disputes the facts, but he does not lay out specifically which portions of the factual information in the motion he disputes. In their

---

[1] Due to their involvement with the legal system, the Court is well aware that many "jailhouse lawyers" offer to help other inmates in legal matters. However, the plaintiff's current plight demonstrates just one of the many reasons why accepting the help of those not licensed to practice law is unsound, and why the unlicensed practice of law is prohibited in both Missouri and Illinois. *See* Mo. Rev. Stat. § 484.020 (1997). *See also* 720 Ill. Comp. Stat. 205/1 (2018). In the future, to avoid unnecessary delay, if the plaintiff is unaware of next steps, the plaintiff should consult the pro se litigant guide or seek licensed legal counsel of their own volition.

reply, the defendants argue that the plaintiff's failure to specify specific facts in dispute and their untimely response to the motion demands that the Court accept all facts as presented in their motion as undisputed and grant partial summary judgment as requested.

## II.     LEGAL STANDARD

### A. Summary Judgment

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

Nevertheless, the "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotations and citations omitted). *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) ("[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'") (quoting *Visser v. Packer Eng'g Assocs.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc))).

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmoving party carries the burden of proof at trial,

6

the moving party may satisfy its burden of production in one of two ways: it may present evidence that affirmatively negates an essential element of the nonmoving party's case, *see* FED. R. CIV. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence, *see* FED. R. CIV. P. 56(c)(1)(B). *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169. Where the moving party fails to meet its strict burden, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-26; *Liberty Lobby*, 477 U.S. at 256-57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Liberty Lobby*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Liberty Lobby,* 477 U.S. at 252. *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757 (7th Cir. 2021) ("[N]o matter how tempting it might be on summary judgment to be distracted by the sparkle of seemingly compelling facts, [the Court's] assigned task is to take the facts in the light most favorable to the non-moving party.").

### B. Fourteenth Amendment

The Fourteenth Amendment to the United States Constitution provides, in relevant part, that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of

7

citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Fourteenth Amendment's protections also extend to conditions of confinement for pretrial detainees. *Hardeman v. Curran*, 933 F.3d 816, 821-22 (7th Cir. 2019).

If a pretrial detainee plaintiff believes their rights have been violated under the Fourteenth Amendment, they may bring an action under 42 U.S.C. § 1983. When suing under 42 U.S.C. § 1983, a pretrial detainee plaintiff may sue an entity or person in their individual or official capacity.

As § 1983 does not contemplate respondeat superior liability, *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002), a plaintiff must show that a person being sued in their individual capacity, was "personal[ly] involve[d] in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). In other words, a plaintiff must show that a defendant's personal actions violated the Fourteenth Amendment.

In the past, conditions-of-confinement claims pursuant to the Fourteenth Amendment and Eighth Amendment were analyzed under the same test. This test had a subjective and objective component; a plaintiff pretrial detainee alleging that conditions of confinement failed to protect them from harm were required to show that (1) they were incarcerated under conditions posing a substantial risk of serious harm ("objective component") and that (2) the defendants showed deliberate indifference to their health or safety ("subjective component").

Recently, however, the Supreme Court and the Court of Appeals for the Seventh Circuit have recognized that pretrial detainees are only required to show the objective component of the conditions-of-confinement analysis. *Hardeman v. Curran*, 933 F.3d at 822. When evaluating conditions-of-confinement and failure-to-protect claims brought by pretrial detainees, the

plaintiff need only show that they were incarcerated under conditions posing a substantial risk of serious harm (the objective component). *Id.*

To prove that their incarceration conditions posed a substantial risk of serious harm, a plaintiff pretrial detainee must show that (i) the defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of the plaintiff's case and (ii) the defendants' actions were not objectively reasonable. *Pittman v. Cty. of Madison*, 970 F.3d 823, 827 (7th Cir. 2020).

Courts cannot apply an objective reasonable analysis "mechanically." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). "Rather, objective reasonableness turns on the facts and circumstances of each particular case." *Id.* (internal quotations and citations omitted). A court evaluates objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not . . . [based on] hindsight." *Id.*

In respect to jail personnel: "a jail official's response to serious conditions of confinement is objectively unreasonable when it is not rationally related to a legitimate nonpunitive governmental purpose or is excessive in relation to that purpose." *Mays v. Emanuele*, 853 F. App'x 25, 26-27 (7th Cir. 2021) (internal quotations omitted). Additionally:

> A court must . . . account for the legitimate interests that stem from [the Government's] need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.

*Kingsley*, 576 U.S. at 398 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)) (internal quotations omitted).

While courts "sensibly defer within broad limits to the judgments of prison administrators," *Toston v. Thurmer*, 689 F.3d 828, 830 (7th Cir. 2012)—in other words, courts do not "freely substitute their judgment" for the judgment of prison administrators, *Whitley v.*

9

*Albers*, 475 U.S. 312, 322 (1985)—deference, even "substantial deference," *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003), is not unlimited. Beyond the provision that courts "*sensibly* defer," *Toston*, 689 F.3d at 830 (emphasis added), deference is not blind judicial ratification. When "substantial evidence in the record [indicates] that [jail] officials have exaggerated [their] response" to the "need to preserve internal order and discipline and to maintain institutional security," *Bell v. Wolfish*, 441 U.S. at 547, those jail officials are not entitled to deference.

The duty to protect against unconstitutional conditions of confinement extends to protecting prisoners from violence:

> There is no doubt that jail officials have a duty to protect detainees from violence at the hand of other inmates . . . . But liability of a jail officer for failure to protect an inmate only materializes if the officer knew the inmate faced a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it.

*Grieveson v. Anderson*, 538 F. 3d 763, 777 (7th Cir. 2008) (internal citations and quotations omitted). However, prisoners must provide *sufficient information* before jail staff can be liable and the threat must be specific to the prisoner—not a mere generalized fear or general risk of violence. *Id.* at 776. *Thomas v. Dart*, 89 F.4th 835, 841 (7th Cir. 2022). *Dale v. Poston*, 548 F.3d 563, 563 (7th Cir. 2008). "[I]t must be plausibly alleged that a reasonable officer in a defendant's circumstances would have appreciated the high degree of risk the detainee was facing," *Thomas v. Dart*, 89 F.4th at 841–42, i.e., the officer must not have been merely negligent, the officer must have "reckless[ly] disregard[ed] the risk in the fact of an unjustifiably high risk of harm." *Id.* at 842 (quoting *Westmoreland v. Butler County*, 29 F.4th 721, 730 (6th Cir. 2022)).

In the context of deliberate indifference to medical claims, plaintiffs must establish "an objectively serious medical need . . . that guards were deliberately indifferent to." *Grieveson v. Anderson*, 538 F.3d at 779. While the medical condition must be objectively serious, that does

10

not mean staff can ignore non-life-threatening injuries. *Id.* at 779 ("A delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate-indifference claim."). The evidence must show that the delay in medical treatment unnecessarily prolonged and/or exacerbated the plaintiff's pain. *Id*. However, if the prisoner is provided medical care, a defendant is not liable for those medical decisions unless an official knows that an inmate is receiving inadequate medical care:

> Although pretrial detainees have a right under the Fourteenth Amendment to adequate medical care, we have long recognized that correctional institutions typically engage in the division of labor between medical professionals and other security and administrative staff. When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention. So the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses without fear of liability for doing so. An exception exists only if a jail official *had reason to know* that the medical staff was failing to treat or inadequately treating an inmate.

*McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (emphasis added) (internal citations and quotations omitted).

To survive summary judgment, a plaintiff asserting a conditions-of-confinement claim is required to "provide evidence from which a reasonable factfinder could conclude that [the defendants] responded in an 'objectively unreasonable' way to unconstitutional conditions of confinement or to a serious medical need." *Wood v. Milwaukee Cnty.*, 2023 U.S. App. LEXIS 21871, *4 (7th Cir. 2023).

### C. Qualified Immunity

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known. *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000).

The qualified immunity test has two prongs: (1) whether the defendant violated a constitutional right, and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Pearson*, 555 U.S. at 232; *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

"If the evidence demonstrates that there may have been a constitutional violation, then the court should determine whether the right allegedly violated was clearly established at the relevant time." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (overruled on other grounds). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. at 201; *see McNair v. Coffey*, 279 F.3d 463, 465 (7th Cir. 2002).

To show that the law in question was clearly established at the time of the misconduct, the law "must have placed the constitutionality of the [defendant's] conduct beyond debate" such that "every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotations omitted). The law must have been "settled law," that is, it must have been "dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589-90 (internal quotations omitted). Generally, this requires a high degree of specificity in the precedent so that every reasonable officer would have been alerted to the law in the particular circumstances. *Id.*

### III. <u>ANALYSIS</u>

Generally, when a nonmovant fails to respond to a motion for summary judgment, fails to address specific facts, or fails to respond; the nonmovant accepts the movant's facts as alleged in the motion as undisputed and true. However, when a nonmovant is *pro se*, courts construe those

responses liberally. *See Anderson v. Hardman*, 241 F.3d 544, 545 ("pro se pleadings are held to less exacting standards than those prepared by counsel and are to be liberally construed."). If a *pro se* litigant disputes facts in the summary judgment motion, but fails to enumerate which facts they dispute, so long as they provide sufficient factual detail to make it clear which facts they are disputing, courts do not regard those facts as undisputed. Even in cases where there is no response and the plaintiff fails to dispute certain facts, the movant is not automatically entitled to summary judgment. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011)) ("Even where a non-movant fails to respond to a motion for summary judgment, the movant still [must] show that summary judgment [is] proper given the undisputed facts.") The movant still bears the burden of showing that there are no disputes of material fact and that they are entitled to judgment as a matter of law. If a movant fails to meet that burden, they are not entitled to summary judgment.

Here, Meeks is *pro se* and while his response is unquestionably untimely, he did comply with the Court's order to show cause, he presents a meritorious argument, and he disputes some material facts that the defendants have failed to adequately show are undisputed. Therefore, the Court will proceed with its analysis considering the information raised in Meeks's response.

### A. Former Sheriff Wolff & Former J.A. Peters

In his response to the order to show cause, Meeks alleges that "[d]espite not being present or having knowledge of a possible violent confrontation as a result of moving the Plaintiff from Block 4 to Block 2, Defendant Wolff is still colpable [sic] for the behavior of those employed under him." (Doc. 43). Meeks does not make any allegations in his reply about former J.A. Peters's personal involvement or lack thereof.

Again, § 1983 does not contemplate respondeat superior liability and, at screening, the

official capacity claims against both former sheriff Wolff and former J.A. Peters were dismissed. Consequently, Wolff and Peters may only be liable for alleged violations they personally took part in. As Meeks does not dispute that Wolff was *not* personally involved, Wolff is entitled to summary judgment on all counts.

Meeks's reply does not dispute the defendants' claims that Peters had no knowledge of the attack, however Meeks *does* dispute whether Peters was aware of the danger. In his affidavit, Peters writes that he "spoke with . . . Meeks, and [Meeks] told [Peters] that he did not have conflict with *anyone* in block 2." (Doc. 40, Ex. D) (emphasis added). In Officer Guisen's declaration, Guisen states that "Peters and [Guisen] spoke with detainee Antoine Meeks, and he told [them] that he did not have a conflict with *anyone* in block 2." (Doc. 40, Ex. E) (emphasis added).

However, despite both affidavits, in his deposition, Meeks claims that when J.A. Peters and Officer Guisen came to his cell the day before his relocation, that he told both of them that he could not and would not move to Block 2 because he had "dudes [he's] into with from the streets over there." (Pl. Depo., 32:1-15).[2] Meeks did not mention the name of the specific individual he had conflict with—Maurice Lee, who again, went by the alias "M1," (Pl. Depo., 35:1-2)—however, according to Meeks, Peters merely replied "okay." Neither Peters nor Guisen inquired further before leaving the cell. Unbeknownst to Meeks, Peters assigned him to Block 2 regardless.

Facially, the affidavits and Meeks's deposition testimony conflict. While it is certainly possible that, when both affidavits stated that Meeks told them that he was not in conflict with "anyone" in Block 2, Peters and Guisen meant that Meeks did not name any one person, though

---

[2] The statement "being into it with" was understood by all involved to mean "being in or having conflict with."

14

Meeks had still expressed a generalized concern;³ but it seems more likely that the affidavits and Meeks's testimony contradict one another. Whether, and what, Meeks told Peters and Guisen concerning his reasons for not wanting to be transferred to Block 2 is a dispute of material fact.

The defendants argue this fact is immaterial; they argue that because Meeks did not explicitly identify Lee specifically or elaborate, that Meeks's safety concern was too generalized to establish liability. However, it is common knowledge that criminal leaders—especially in prison—often use others to inflict violence on their orders. Given prisoners are highly limited in what information they have access too, it would be absurd to demand that prisoners know the name and location of every individual they may be in conflict with.

The question is not whether Meeks provided a specific name or identifier, it is whether Meeks provided sufficient information to put Peters and Guisen on notice of the threat. Prison staff can be liable if they "knew of threats to a *specific detainee* posed by a *specific source*;" but also when "the specific identity of the ultimate assailant is not known in advance of [the] assault," regardless of whether the likely threat arises from "the victim's characteristics, not the assailant's," or whether the threat comes from one or multiple sources. *Brown v. Budz*, 398 F.3d 904, 915 (7th Cir. 2005) (collecting cases). So long as the "plaintiff was known to be . . . a targeted inmate and therefore a member of an identifiable group of prisoners for whom risk of assault was a serious problem," that is sufficient to place staff on notice. *Id.* (quoting *Walsh v. Mellas*, 837 F.2d 789, 796 (7th Cir. 1988)).

Here, interpreting the facts in favor of the nonmovant, presuming Meeks did relay the information he claims to Peters, the threat was not a generalized anxiety or overall general fear; Meeks expressed a *specific* fear of being moved to a *specific* block with a *specific* group of

---

³ Even were this true—that Peters and Guisen meant that Meeks did not identify a specific individual, but still identified a threat—the affidavits would be misleading, and the specifics would still be material.

15

inmates (those he was "into it with"). While the identities of those specific inmates were unknown, staff are put on notice when they become aware of a substantial risk specific to the prisoner from a specific source, even if they are unknown.[4]

Additionally, while the identities of some inmates were unknown to Meeks, at least one of them was: Maurice Lee. Again, viewing the factual dispute in favor of Meeks, if he informed Peters and Guisen that he had conflict with one or more of the prisoners in Block 2, Peters left without asking further, clarifying questions, and moved Meeks anyway—if true, that would be sufficient to establish a prima facie claim of deliberate indifference. If Meeks informed Peters of a possible threat and Peters sought no clarifying information, Peters cannot claim ignorance of the scope of that threat later on; willful blindness is not a valid defense.

For the reasons explained above, there *are* genuine disputes of material fact. The defendants have invoked qualified immunity; however, that immunity would not entitle Peters to summary judgment on all counts. If Peters knew of a specific threat to Meeks and disregarded that risk by not clarifying and by moving him anyway, that may establish that Peters actions were directly contrary to established law. If Meeks's allegations are true, a reasonable jail administrator in Peters's position, knowing what Peters knew—that Meeks was in conflict with some inmates in Block 2—would not have assigned Meeks to that block without, at the very least, investigating the scope and seriousness of that threat. *See Walsh v. Mellas*, 837 F.2d at 789 ("defendants' failure to establish a procedure for the screening of the file of an inmate to be

---

[4] For example, many jails and prisons screen newly booked prisoners to identify unique risk factors; one of those unique risk factors is gang affiliation. If, during screening, staff become aware that a newly-booked prisoner is a member of one gang and are aware that members of a rival gang are present in a particular block, prison staff cannot place the newly booked prisoner in that same block and escape liability when the newly-booked prisoner is attacked. This is common sense—if one individual says to another "we will meet you at the restaurant tonight at 6:00 PM," the fact that the listener is unsure who "we" refers to does not change the listeners awareness of the time and place of meeting; it is enough information to put one that individual on notice, even if precisely how many people they will be meeting is unknown. If a threat is specific to the prisoner, specific to a particular place, and from at least one source; the fact that the multiple sources are unknown does not absolve the prison staff of liability.

16

assigned to the 'investigative status' area of the prison to ensure some level of compatibility with his cellmate supports the trial judge's conclusion that the defendants exhibited . . . 'deliberate indifference' to a prisoner's right to security . . . ."). Accordingly, Peters is not entitled to summary judgment on Count One.

Concerning Count Two—deliberate indifference to medical claims—Peters is entitled to summary judgment. In Meeks's deposition, he states that, the day after the attack, he told Peters he wished to go to the hospital for his injuries and asked if Peters had received photos of those injuries. According to Meeks, Peters denied that he had seen the photos and did not put in a request for Meeks to be sent to the hospital.

Regardless of whether Meeks's account of the events are true, assuming *arguendo* it is, Meeks does not allege that he gave any specifics to Peters; he only writes that he told Peters he wanted to go to the hospital. Moreover, the nurse refused Meeks's request, and the physician that Officer Usher had spoken to directly after the attack did not recommend hospitalization. Even if Peters had unilateral authority to override the decision of two different, qualified medical staff and order Meeks be sent to the hospital, Meeks did not have life-threatening injuries nor any apparent signs of *serious* injury. Thus, Peters had no reason to believe, let alone *know*, that the medical care Meeks was actively being provided was inadequate—assuming the medical care was actually inadequate (and there is no indication that it was). Because Peters is only liable if he *knew* that the medical care Meeks was received was inadequate, *McGee v. Parsano*, 55 F.4th at 569, without clear indication that the jail's care was inadequate *and* that Peters was supplied with knowledge that Meeks was receiving inadequate medical care, Peters is not liable. Accordingly, former J.A. Peters is entitled to summary judgment on Count Two.

### B. Officer Guisen

Meeks does not allege that Officer Guisen engaged in any specific acts that violated his constitutional rights. Officer Guisen was present when J.A. Peters spoke with Meeks about his move. However, Officer Guisen had no control over Meeks's housing, nor does Meeks allege that he told Officer Guisen anything that he had not already relayed to J.A. Peters—whether that information was, as the defendants contend, that Meeks had no enemies in Block 2 or, as Meeks contends, that he had several enemies in Block 2. As housing assignments are beyond the authority of Guisen and Guisen had no further interactions with Meeks in any capacity, including the medical aftermath, there are no genuine disputes of material fact as to Officer Guisen's involvement, he is entitled to summary judgment on all counts.

### C. Officer Usher

As the defendants have not moved for summary judgment in favor of Usher on Count One, the Court only considers Count Two—the inadequate medical care claim.

In the incident report for the day of the fight, after Usher rescued Meeks, he called the doctor, who recommended Tylenol and ice based on his injuries. Usher took Meeks's vitals and determined that all seemed normal. Usher then called Peters and informed him of the altercation. Meeks alleges that after he was rescued, returned to Block 4, and given Tylenol and an ice pack, that it took four hours to receive care, and, the next day, the nurse refused to examine him and refused to take him to the hospital or to a doctor. Meeks alleges that Usher is in some way responsible for inadequate medical care.

Usher, as an officer, defers to the advice of the jail's medical personnel unless he knew that the medical care Meeks was receiving was inadequate. Usher is not a doctor, nor is he a trained medical professional; therefore, his ability to accurately diagnose non-obvious medical

18

ailments is limited. When Usher rescued Meeks and returned him to Block 4, he took Meeks's vital signs and confirmed that Meeks was not in immediate danger nor had sustained life-threatening injuries. After ensuring that Meeks was in no immediate danger, Usher called a doctor and described Meeks's condition. The doctor advised Usher to provide Meeks Tylenol and an ice pack. Had the doctor believed the situation was sufficiently serious, he would have recommended Usher arrange for Meeks to be taken to the hospital. There is no indication that the care Meeks received was inadequate nor any indication that, even if it was, Usher had sufficient knowledge of that care's inadequacy.

While Meeks takes umbrage with waiting four hours to receive the Tylenol and ice pack, Usher checked his vitals immediately afterward and determined he was stable. At that point, there was no indication that waiting for a few hours would have exacerbated Meeks's condition. Had Meeks been taken to an emergency room, medical personnel would have triaged him, in a similar way Usher did; concluded that he was not in immediate danger, as Usher and the doctor did; and would place him lower on the priority list to be seen by a doctor. In fact, between the time to transport him to the hospital and the wait to be seen by a doctor given Meeks' condition was not urgent; the wait time may have been comparable or even longer.

For the reasons stated above, Usher is entitled to summary judgment on Count Two.

**IV.   CONCLUSION**

There are sufficient genuine disputes of material fact such that a reasonable factfinder could conclude that Peters, in his individual capacity, violated the plaintiff's Fourteenth Amendment rights with respect to Count One and that he is not protected by qualified immunity. Therefore, Peters is not entitled to summary judgment on Count One.

However, the defendants have demonstrated that there are no genuine disputes of

material fact and that they are entitled to judgment as a matter of law on Count Two for both Peters and Usher. Furthermore, the defendants have also shown that there are no genuine disputes of material fact and that they are entitled to summary judgment as a matter of law on all counts for Wolff and Guisen.

Therefore, the Court **GRANTS in part and DENIES in part** partial summary judgment. The Court **GRANTS** summary judgment in favor of **SHANNON WOLFF** and **CHRIS GUISEN** on **ALL COUNTS**. Additionally, the Court **GRANTS** summary judgment in favor of **JARROD PETERS** and **CODY USHER** on **COUNT TWO** but **DENIES** summary judgment for **JARROD PETERS** on **COUNT ONE**. As the defendants did not move for summary judgment for **CODY USHER** on **COUNT ONE**, that count is also **RETAINED**.

The plaintiff has demanded a jury trial, therefore, **COUNT ONE** shall proceed to jury trial against both **JARROD PETERS** and **CODY USHER**.

**IT IS SO ORDERED.**
**DATED:  October 7, 2024**

                                               *s/ J. Phil Gilbert*
                                               **J. PHIL GILBERT**
                                               **DISTRICT JUDGE**